UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RICHARD L. STACEY, SR., individually as the natural brother and heir to EDWIN B. STACEY, deceased; DOUGLAS J. STACEY, as the Personal Representative of the ESTATE OF EDWIN B. STACEY, and individually as the natural brother and heir to EDWIN B. STACEY, deceased; and KENNETH J. STACEY, as the natural brother and heir to EDWIN B. STACEY, deceased, | Case No. 4:23-cv-00119-AKB (lead) **MEMORANDUM DECISION AND ORDER** |

Plaintiffs,

v.

COUNTY OF MADISON, a subdivision of the state of Idaho; RICK S. HENRY, in his official capacity as Sheriff of Madison County Sheriff's Office and in his individual capacity; JARED WILLMORE, in his official capacity as the Captain of Madison County Detention Center and in his individual capacity; MITCH GROVER, in his official capacity as a Sergeant of Madison County Detention Center and in his individual capacity; MADISON COUNTY SHERIFF'S OFFICE; MADISON COUNTY DETENTION CENTER; STATE OF IDAHO; and JOHN/JANE DOES I-X, whose true identities are presently unknown,

Defendants.

RICHARD L. STACEY, SR., individually as the natural brother and heir to EDWIN B. STACEY, deceased; DOUGLAS J. STACEY, as the Personal Representative of the ESTATE OF EDWIN B. STACEY, and individually as the natural brother and heir to EDWIN B. STACEY, deceased; and KENNETH J. STACEY, as the natural brother and heir to EDWIN B. STACEY, deceased,

        Plaintiffs,

   v.

COUNTY OF MADISON, a subdivision of the state of Idaho; JARED WILLMORE, in his official capacity as the Captain of Madison County Detention Center and in his individual capacity; MITCH GROVER, in his official capacity as a Sergeant of Madison County Detention Center and in his individual capacity; MADISON COUNTY SHERIFF'S OFFICE; MADISON COUNTY DETENTION CENTER; STATE OF IDAHO; and JOHN/JANE DOES I-X, whose true identities are presently unknown,

        Defendants.

Case No. 4:23-cv-00444-AKB (consolidated)

# I.    INTRODUCTION

On October 8, 2021, Robert Pompa murdered Edwin B. Stacey by beating him to death after a disagreement over an electronic tablet. At the time, Pompa and Stacey were inmates housed in the same housing unit or "Pod" at Defendant Madison County Detention Center ("MCDC") in

Rexburg, Idaho. Stacey was serving a ninety-day sentence for a misdemeanor conviction for driving under the influence. Meanwhile, Pompa was a federal detainee, who had a history of violence and was awaiting sentencing for a federal conviction. Pompa was detained at MCDC pursuant to a contract between MCDC and the United States Marshals Service ("USMS") to house federal detainees pending federal criminal proceedings.

Following Stacey's death, his estate and his brothers sued Madison County, MCDC, and the Madison County Sheriff's Office (collectively "the County").[1] They also sued the Madison County Sheriff, Rick Henry; Captain Jared Willmore; and Sergeant Mitch Grover (collectively "the Individual Defendants")—in both their official and individual capacities. Plaintiffs allege claims under 42 U.S.C. § 1983 (Dkt. 18). Plaintiffs also move for sanctions against the County for spoliating video footage from MCDC on the day of the murder (Dkt. 37).

The Court heard oral argument on both motions on May 16, 2025. For the reasons set forth below, the Court grants summary judgment as to the Individual Defendants but denies it as to the County. Further, the Court grants Plaintiffs' motion for spoliation sanctions, although it does not find the County intended to destroy evidence.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    MCDC's Classification and Housing

In October 2020, MCDC entered a contract with the USMS to house federal detainees at MCDC (Dkt. 46-1 at 111-123). The contract required MCDC to "accept and provide for the secure custody, safekeeping, housing, subsistence and care of Federal detainees in accordance with all state and local laws, standards, regulations, policies and court orders applicable to the operation of

---

[1]    Defendants note that MCDC and the Madison County Sheriff's Office are both subdivisions of the County and not separate entities (Dkt. 41 at 2 n.1).

the Facility" (*id.* at 113). The contract further required "Federal detainees" to "be housed in a manner that is consistent with Federal law and the Federal Performance Based Detention Standards ["Federal Standards"] and/or any other standards required by an authorized agency whose detainees are housed by the Local Government pursuant to this Agreement" (*id.*). The Federal Standards provide that the classification system "is used to separate prisoners into groups that reduce the probability of assault and disruptive behavior" (Dkt. 46-2 at 10).

MCDC's Policies and Procedures identify three phases of inmate classification: initial classification, primary classification, and reclassification (Dkt. 46-1 at 69-77). MCDC's primary classification policy, Policy # 3.2, provides for three levels of classification—maximum, medium, and minimum-security, and the maximum-security classification is for those inmates "who pose[] a real and present high risk to the security of the jail or the safety of the staff, visitors, and other inmates" (*id.* at 72-73). Policy # 3.2 provides MCDC is "to classify inmates in a way that not only ensures public safety but also provides for safe, humane inmate treatment by housing like offenders together to the extent possible" (*id.* at 71). Further, Policy # 3.2 provides that "once the classification status has been decided, the Classification Deputy will assign the inmate's housing and bed location as determined by the classification" (*id.* at 75).

For purposes of complying with MCDC's classification policy, Policy # 3.2 provides that "the Jail Administrator shall designate at least one facility employee as Classification Deputy who is trained in classification techniques, made responsible for administration of the classification system and trains the other detention deputies in the techniques of classification" (*id.* at 71). At the time of Stacey's murder, Captain Willmore was MCDC's Jail Administrator (*id.* at 46-47), and Sergeant Grover was the Classification Deputy (*id.* at 51). Meanwhile, Sheriff Henry managed the MCDC (*id.* at 10-11).

MEMORANDUM DECISION AND ORDER - 4

### 2.    Pompa's and Stacey's Incarceration

From May 1, 2020, through March 1, 2021, Pompa was incarcerated at the Bannock County Detention Center, which classified him as a maximum-security inmate (Dkt. 46-3 at 5-6). While incarcerated there, "Pompa was involved in 11 disciplinary incidents, including four fights resulting in significant injuries to other inmates and criminal charges against him for Aggravated Battery" (*id.* at 6). On March 2, Pompa was transferred to Bonneville County Jail, which also classified him as a maximum-security inmate and designated him as "a serious violent threat and gang member" (*id.*). Shortly thereafter, on March 30, Pompa was transferred to MCDC (*id.* at 5). At the time, Pompa was a federal detainee awaiting sentencing on a federal charge (*id.*).

When Pompa arrived at MCDC, a newly hired detention deputy, Austin Burshia, classified Pompa as a medium-security inmate (*id.*). At the time, Deputy Burshia had worked at MCDC for less than a week, had never classified an inmate previously, and had no training in classifying inmates (Dkt. 43-8 at 81; Dkt. 46-2 at 29). Sergeant Grover was not involved in Pompa's initial classification, despite being the Classification Deputy, and did nothing to ensure Deputy Burshia's classification decision about Pompa was consistent with MCDC's classification policy. During his deposition, Sergeant Grover admitted that based on Pompa's prior charges, he should have been classified as a maximum-security inmate (Dkt. 46-1 at 103).[2]

---

[2]    Pompa was not the only inmate that MCDC misclassified during this timeframe. On September 22, 2021, not long after Stacey was booked into MCDC, MCDC booked and classified Pierre Lake, who was charged with two counts of attempted murder with a deadly weapon, one count of burglary, and one count of grand theft (Dkt. 46-1 at 174). Before the booking, Lake had admitted to shooting an individual in the head and attacking another individual with a knife (*id.* at 174-75). Despite these serious charges, MCDC classified Lake as a medium-security inmate and assigned him to Pod D with Stacey (*id.* at 178).

Within two weeks of Pompa's transfer to MCDC, Pompa was cited for possession of contraband and assessed sixteen days of lockdown and nineteen days of privilege loss (*id.* at 194). When Pompa was released from this lockdown, Sergeant Grover, without explanation, downgraded Pompa's security level from a medium 3 security level to a medium 4 security level. (Dkt. 37-2 at 220).

After being on lockdown, Pompa resumed his violent conduct on July 17, 2021, when he instigated a fight with a fellow inmate and injured him (Dkt. 46-1 at 185-193). The other inmate reported he and Pompa "were having an argument over what they were watching on the tv [when] Pompa started hitting him" (*id.* at 190). Although the other inmate tried to walk away, Pompa continued to attack him until detention deputies arrived (*id.*) Pompa was placed on lockdown for twenty days, issued a "class three" rule violation, and charged with misdemeanor battery (*id.* at 185; Dkt. 37-2 at 220).

Meanwhile, on September 7, 2021, Stacey pled guilty to a charge of driving under the influence, was sentenced to a 180 days of incarceration with 90 days suspended, and was booked into MCDC (Dkt. 43-8 at 21-26). MCDC classified Stacey as a minimum-security inmate, which, according to MCDC's classification system, is a non-violent inmate (*id.* at 35). He was given a bed and housing assignment in housing Pod D (also referred to as "D Pod") (Dkt. 46-1 at 54).

At the time of Stacey's incarceration, MCDC had six separate housing units, Pods A, B, C, D, E, and F (Dkt. 46-1 at 141). Pods A, C, and D housed general population, male inmates (*id.*).[3] MCDC housed inmates with different classifications in these Pods. According to Captain Willmore, MCDC generally housed maximum and medium-security inmates in Pod D (*id.*).

---

[3]    Pod B housed special needs inmates and sex offenders; and Pods E and F housed female inmates (Dkt. 46-1 at 87, 41, 141).

**MEMORANDUM DECISION AND ORDER - 6**

Regardless, MCDC housed Stacey in Pod D, and about a week after this assignment, MCDC transferred six inmates, including Pompa, to Pod D.

### 3.    Stacey's Murder

On October 8, 2021, approximately one week after MCDC transferred Pompa to Pod D where it also housed Stacey, Pompa beat Stacey to death in Pod D's common area. At 3:53 p.m., video footage shows Stacey sitting at a table in the common area watching TV when Pompa approached him, stood over him, and appeared to be having a conversation with him (Dkt. 37-2 at 13; Ex. F, G (video footage)). Without warning, Pompa began striking Stacey repeatedly in the head until Stacey collapsed on the floor (*id.*). Stacey was later rushed to the local hospital where he was ultimately pronounced dead (*id.* at 14). After Stacey's death, Pompa explained he attacked Stacey because of a disagreement over an electronic tablet (*id.* at 34).

## B.    Procedural Background

Plaintiffs initiated this action in March 2023 against the County and Sheriff Henry, alleging claims under 42 U.S.C. § 1983 and state law claims for negligence and recklessness and for negligent retention, training, and supervision (Case No. 4:23-cv-00119-AKB). Later, Plaintiffs discovered Captain Willmore's and Sergeant Grover's alleged involvement. Shortly before the statute of limitations ran, Plaintiffs initiated a separate action which was nearly identical to their first action, except that it also named Captain Willmore and Sergeant Grover as defendants (Case No. 4:23-cv-00444-BLW). Thereafter, Plaintiffs moved to consolidate the two cases, and the Court granted that motion (Dkt. 33). Subsequently, Defendants moved to dismiss Plaintiffs' claims, and the Court granted that motion in part, dismissing Plaintiffs' state law claims (Dkt. 36). Accordingly, Plaintiffs only remaining claims are their § 1983 claims.

During discovery, Plaintiffs learned that the County had failed to preserve certain video footage from MCDC's control room and from Pod D, which Plaintiffs contend related to Stacey's murder. As a result, Plaintiffs move for sanctions and seek a jury instruction that the missing video "would have been adverse to Defendants and favorable to Plaintiffs' claims" (Dkt. 37-1 at 4). Meanwhile, Defendants move for summary judgment on Plaintiffs remaining claims.[4]

## III.   ANALYSIS

### A.   Summary Judgment

#### 1.   Legal Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence is insufficient. *Id.* at 252. Rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* In deciding whether there is a genuine dispute of material fact, the court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255; *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

---

[4]     Defendants identify Plaintiffs' remaining claims as Count I, a § 1983 claim against all Defendants; Count III, a claim for "negligent retention, training, and supervision"; and Count IV, a claim for "*Monell* Liability" (Dkt. 18 (alleging claims); Dkt. 43-1 (identifying remaining claims)). In doing so, Defendants apparently construe Count III to assert a § 1983 claim for failure to train and supervise.

2.        **Eighth Amendment's Cruel and Unusual Punishment Clause**

Plaintiffs' § 1983 claims are premised on the Eighth Amendment's Cruel and Unusual Punishment Clause. Under the Eighth Amendment, a convicted inmate has the right to be free from "cruel and unusual punishments." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citation omitted). Inmates injured while in custody may seek relief under the Eighth Amendment. *See Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (en banc). The Eighth Amendment imposes a duty on prison officials to "take reasonable measures to guarantee the safety of the inmates." *Farmer*, 511 U.S. at 832 (quotation and citation omitted).

This duty encompasses a duty "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (quotation and citation omitted). As the U.S. Supreme Court recognized in *Farmer*, "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (citation and quotation marks omitted). To prove a violation of the Eighth Amendment predicated on a failure to prevent harm, a plaintiff must show: (1) the inmate "[was] incarcerated under conditions posing a substantial risk of harm"; (2) the defendants were deliberately indifferent to that risk; and (3) their conduct or failure to act proximately caused the harm the plaintiff suffered. *Id.*; *see also Castro*, 833 F.3d at 1065-66.

Here, Plaintiffs allege the County and the Individual Defendants in the official capacities[5] are liable for deliberate indifference to Stacey's constitutional right to be protected against violence by other inmates. Plaintiffs rely on two theories—the County failed to train and supervise its staff

---

[5] As noted above, Plaintiffs assert claims against the Individual Defendants in both their official and individual capacities. "A suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Gomez v. Vernon*, 255 F.3d 1118, 1126 (9th Cir. 2001) (citing *McRorie v. Shimoda*, 795 F.2d 780, 783 (9th Cir. 1986)). Accordingly, the Court addresses the County's liability and the Individual Defendants' liability in their official capacities jointly.

on its inmate classification procedures, and the County followed practices that were contrary to its established policies. Additionally, Plaintiffs also allege the Individuals Defendants are liable in their personal capacities.

### 3.    The County's Liability

A municipal entity, such as a county, is not liable for a § 1983 violation under a theory of respondeat superior for its subordinate's actions. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Rather, to establish a municipality is liable for a *Monell* claim, a plaintiff must show first the municipality's policy or custom led to the plaintiff's injury. *Id.* There must be a "direct causal link between a municipal policy and custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Further, "[t]he custom or policy must be a 'deliberate choice' to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Castro*, 833 F.3d at 1075 (ellipses omitted; quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality)).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006)). "A policy can be one of action or inaction," such as a failure to train or supervise. *Long*, 442 F.3d at 1185 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). A policy also may include longstanding practices so entrenched as to constitute standard operating procedure. *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Second, the plaintiff must show the municipality's policy or custom reflects deliberate indifference to the plaintiff's constitutional rights. *Canton*, 489 U.S. at 392. The standard for determining a municipality's deliberate indifference is an objective standard. *Castro*, 833 F.3d at 1076 (citing *Farmer*, 511 U.S. at 841). Courts have reasoned that "an objective standard applies to municipalities 'for the practical reason that government entities, unlike individuals, do not themselves have states of mind.'" *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1248-49 (9th Cir. 2016) (quoting *Castro*, 833 F.3d at 1076) (explaining that subjective standard only applies to deliberate indifference claims against prison *officials* and that objective standard applies to municipalities).

To satisfy an objective standard of deliberate indifference, a plaintiff must show the facts available to the municipality's policymakers put them "on actual *or constructive notice* that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Castro*, 833 F.3d at 1076 (quoting *Canton*, 489 U.S. at 396) (O'Connor, J. concurring). Meeting "[t]his standard does not require proof of a prior injury. A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 682 (9th Cir. 2021). Otherwise, every municipal defendant would get "one free pass" for its unconstitutional policies or practices. *Id.* (citation omitted). Also, a municipality's deliberate indifference may be inferred from its adoption and disregard of policies that explicitly acknowledge that substantial risks of serious harm exist. *Castro*, 833 F.3d at 1077-78; *Sandoval*, 985 F.3d at 682-83.

### a. Inference of Deliberate Indifference

Here, the County argues it is entitled to summary judgment because "Plaintiffs cannot demonstrate any deliberate indifference to a serious risk of harm" (Dkt. 43-1 at 4). Plaintiffs

respond that the County's deliberate indifference may be inferred from the fact that its practices disregard its adopted housing and staffing policies (Dkt. 46 at 6-12). The Ninth Circuit's decision in *Castro* is instructive because—similar to this case—*Castro* involves a county which had an alleged practice contrary to its adopted policy. In *Castro*, the county arrested Castro for public drunkenness and placed him in a sobering cell. 833 F.3d at 1064-65. Later, the defendants placed in the same cell a second detainee, Gonzalez, who had exhibited "bizarre" behavior after his felony arrest for shattering a glass door with his fist. *Id*. at 1065. Despite that the sobering cell did not comply with either the police station's manual or a local ordinance, the county routinely used the cell. *Id*.

Shortly after Gonzalez was placed in the sobering cell, Castro attempted to attract attention by pounding on the window, but no one responded. *Id.* About twenty minutes later, a "volunteer" saw Gonzalez "touching" Castro and reported the contact to an officer. *Id.* Six minutes later, when the officer arrived, Gonzalez was stomping on Castro's head. *Id.* As a result, Castro suffered serious, long-term injuries and brought a § 1983 action against the county. *Id.* at 1064-65. The case proceeded to trial, and the jury awarded Castro more than $2 million in damages. *Id*. at 1066.

Affirming the jury's verdict, the Ninth Circuit ruled that "substantial evidence supported the jury's finding that the [county] knew its cell design might lead to a constitutional violation among its inhabitants." *Id.* at 1076. In support, the Ninth Circuit concluded Castro had satisfied both prongs of a *Monell* claim. First, the Ninth Circuit concluded the county had a custom of using "a sobering cell that lacked adequate audio surveillance to detain more than one belligerent drunk person while checking the cell visually only every half hour" and that this "custom or policy caused Castro's injury." *Id.* at 1075. Second, the Ninth Circuit concluded the county was deliberately indifferent to detainees' constitutional rights. *Id*. at 1078.

In support of this later conclusion, the Ninth Circuit in *Castro* reasoned "'a municipality's policies that explicitly acknowledge the substantial risks of serious harm exist' may demonstrate municipal knowledge of that risk." *Id.* at 1077; *see also Sandoval*, 985 F.3d at 682-83 (ruling reasonable jury could find municipality was deliberately indifferent by failing to follow more rigorous policies it had adopted); *Grizzle v. Cnty. of San Diego*, Case No. 17-CV-813-JLS(PCL), 2018 WL 3689153, at *8 (S.D. Cal. Aug. 3, 2018) (concluding plaintiff may allege *Monell* claim under Eighth Amendment based on municipality's alleged deliberate indifference to its "approved requirements"). The Ninth Circuit ruled that the municipality's "affirmative adoption of regulations aimed at mitigating the risk of serious injury to individuals housed in sobering cells, and a statement to the same effect in the station's manual, conclusively prove the [county] knew of the risk of the very type of harm that befell Castro." *Castro*, 833 F.3d at 1077.

In other words, the county's practice in *Castro* of using the sobering cell which did not comply with applicable regulations established the county's constructive knowledge of a substantial risk of harm that might result by using the cell despite its noncompliance. Here, Plaintiffs identify two of the County's practices which they contend are contrary to the County's established or otherwise applicable policies—namely, the County's practices of understaffing the MCDC and of housing inmates with different classifications in the same housing unit.

### b.    The County's Housing Practice

Plaintiffs assert the County has a practice of housing inmates together, regardless of their classifications for maximum, medium, and minimum-security, and contrary to applicable policies governing the County (Dkt. 46 at 6). In support, Plaintiffs contend the County is bound by three different policies requiring it to house inmates by their classification: MCDC's Policies and Procedures, Idaho Jail Standards, and the Federal Standards (*id.*).

MCDC's Policy # 3.2 provides that "it is the policy of [MCDC] to classify inmates in a way that not only ensures public safety but also provides for same, humane treatment *by housing like offenders togethers to the extent possible*" (Dkt. 46-1 at 51) (emphasis added). Further, Policy # 3.2 provides that "the Classification Deputy will assign the inmate's housing and bed location *as determined by the classification*" (*id.* at 75) (emphasis added). Policy # 3.2 refers to the Idaho Jail Standards,[6] which require that "the facility has a sufficient number of housing units in an appropriate configuration so that inmates can be *separated according to the facility's classification plan*" (*id.* at 314 (§ 18.14) (emphasis added); (*see id.* at 318 (§ 18.46) (same)).

Finally, the Federal Standards provide that "the classification system is used to separate prisoners into groups that reduce the probability of assault and disruptive behavior" (*id.* at 328). According to the County's contract with the USMS, the County is bound to comply with these Federal Standards. That contract provides that "detainees shall . . . be housed in a manner that is consistent with Federal law and the [Federal Standards] and/or any other standards required by an authorized agency whose detainees are housed by the Local Government"[7] (Dkt. 46-2 at 54).

The County does not and cannot dispute that, contrary to these policies and standards, its practice at the time of Stacey's death was to house inmates of all classifications together.[8] Rather,

---

[6]    Policy # 3.2 also refers to ACA Core Jail Standards 1-CORE-2A-16, which provides in part that "an objective classification system is used to separate inmates into groups to reduce the probability of assault and disruptive behavior."

[7]    Although the County's expert witness opines the Federal Standards are "irrelevant" and "do not establish any legal obligation or constitutional standard" (Dkt. 43-5 at 11), the County expressly admits it was required to house inmates in a manner consistent with the Federal Standards (Dkt. 46-1 at 135) (admitting MCDC was "required to house inmates in a manner that is consistent with [Federal Standards]").

[8]    Plaintiffs have presented evidence the County knew it was not housing inmates in accordance with the applicable policies. For example, both Captain Willmore and Sheriff Henry

**MEMORANDUM DECISION AND ORDER - 14**

the County explains that because it is "unable to separate [inmates] solely based on classification, [it] has adopted a policy that takes a *holistic approach* to ensure inmate safety" (Dkt. 43-1 at 14) (emphasis added). Further, the County does not seriously dispute its practice of housing inmates of different classifications together caused Stacey's murder.[9] Rather, the County's argument primarily focuses on the deliberate indifference requirement. Specifically, the County argues "there is no evidence [it] was deliberately indifferent" (*id.* at 12).

As the Ninth Circuit has ruled in *Castro*, however, "'a municipality's policies that explicitly acknowledge the substantial risks of serious harm exist' may demonstrate municipal knowledge of that risk." 833 F.3d at 1077. Such is the case here. The County was subject to three different policies—MCDC's Policy # 3.2, the Idaho Jail Standards, and the Federal Standards— requiring the County to house inmates according to their classifications. A jury could infer from these policies that the County knew the importance of housing inmates according to their classifications to ensure their safety. These policies are sufficient to show the County had at least constructive knowledge, if not actual knowledge, that housing differently classified inmates together was substantially certain to result in a constitutional injury.

---

admitted that the County was required to follow its classification policy and that policy required separate housing for differently classified inmates (*See* Dkt. 46-1 at 15, 147-48). Further, Captain Wilmore and Sergeant Grover admitted inmates were housed together even though they had different classifications (*id.* at 100, 147-48).

[9]      Although the County does not argue there is no causal link between its "holistic approach" of housing inmates who are classified differently together and Stacey's murder, it argues that "Plaintiffs' *Monell* claim must be dismissed as Plaintiffs cannot show that Stacey's constitutional rights were violated" (Dkt. 43-1 at 13). Obviously, however, Stacey's murder was a constitutional violation because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

MEMORANDUM DECISION AND ORDER - 15

During oral argument, the County argued that whether the policies require the County to house inmates by classification is, at best, ambiguous. The Court disagrees. MCDC's Policy # 3.2 unequivocally provides "the Classification Deputy will assign the inmate's housing and bed location as determined by the classification" (Dkt. 46-1 at 75). The Idaho Jail Standards require "the facility has a sufficient number of housing units . . . so that inmates can be separated according to the facility's classification plan" (*id.* at 314), and the Federal Standards provide "[t]he classification system is used to separate prisoners into groups that reduce the probability of assault and disruptive behavior" (*id.* at 328). These policies clearly notified the County it was to house inmates by their classification. Regardless, even if these policies were ambiguous, there is a genuine issue of material fact for the jury whether one or more of them gave the County constructive notice that failing to house inmates by their classifications was substantially certain to cause a constitutional injury.

The County's attempt to distinguish *Castro* fails. It argues that *Castro* is dissimilar because "Stacey lived in D pod for more than a month with a number of maximum-security inmates without a single issue" and "never sought help nor did anything that would indicate that he was in danger" (Dkt. 49 at 10). In contrast, the County notes Castro "was together less than an hour" in the sobering cell with his assailant and "immediately sought help"—apparently referring to Castro pounding on the cell window (*id*). The Ninth Circuit, however, did not rely on these facts when ruling that a municipality's adoption of policies aimed at mitigating a risk of a serious injury proves it knew of that risk. Likewise, the Ninth Circuit did not rely on the nature of the source of the policy in reaching the conclusion that the municipality was deliberately indifferent. Contrary to the County's argument, the Ninth Circuit's ruling is not premised on a local ordinance alone but relies on both an ordinance and the police station's policy manual. *Castro*, 833 F.3d at 1065

(discussing station manual and local ordinance), *id.* at 1077 (discussing adoption of both regulations and manual). That an ordinance existed regarding sobering cells (versus some other type of applicable authority or policy) was not dispositive to the ruling in *Castro* that the defendants were deliberately indifferent.

Also, the County's reliance on *Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188 (7th Cir. 2013), is misplaced. In that case, Smith was assigned a maximum-security classification and housed in a maximum-security cellblock with Newell, who also had a maximum-security classification. *Id.* at 190. After Newell attacked Smith and seriously injured him, Smith filed a § 1983 action against the Sheriff's Department, alleging "the Department's security classification policy failed to protect peaceful inmates like him from a serious risk of assault by inmates who are prone to violence." *Id.* at 190-91. Smith's deliberate-indifference argument was that "the classification policy fail[ed] to strictly segregate 'violent' from 'nonviolent' offenders based on their pending and past charges." *Id.* at 192. The Seventh Circuit rejected this argument and affirmed summary judgment against Smith, reasoning that "Smith presented no evidence that this feature in the classification policy creates a serious risk of physical harm to inmates, much less that the [Department] knew of it and did nothing." *Id.*

Contrary to *Smith*, however, Plaintiffs in this case are not challenging the County's classification policy. Rather, they are challenging the County's failure to follow the classification policies by not segregating minimum-security inmates from other inmates with a higher classification. Unlike Smith and Newell, both of whom had maximum-security classifications, Stacey had a minimum-security classification, and Pompa had at least a medium-security classification, if not more. Whether the County's routine practice of housing inmates with different

security classifications together, contrary to its established policies, gives rise to *Monell* liability is a factual question for trial.

Further, the County's reliance on *Perez v. Jefferson Cnty.*, Case No. 4:21-cv-00432-AKB, 2023 WL 5180139 (D. Idaho Aug. 2023), is also misplaced. In that case, Perez was sexually assaulted while incarcerated. *Id.* at *1. He alleged a sergeant was deliberately indifferent to a substantial risk of harm. *Id.* at *3. In support, Perez argued that the county had a written policy mandating zero tolerance of sexual misconduct; the sergeant allegedly failed to adequately investigate another inmate's report of sexual misconduct before Perez was assaulted; and there was a lack of evidence that the county followed the policy. *Id.* at *4. In rejecting Perez's claim, the court concluded that "a prison official's violation of a prison policy does not establish § 1983 liability; rather, the focus is on whether the defendant violated the plaintiff's federal statutory and constitutional right." *Id.* (citing *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 929 (9th Cir. 2001)). Unlike *Perez*, Plaintiffs here are not asserting an individual defendant failed to follow a policy on one occasion. Rather, Plaintiffs' theory is that the County had a practice contrary to numerous adopted written policies. *Perez* has no application in this distinguishable context.

Finally, the County's argument that "Plaintiffs must first show that some or all of Defendants were deliberately indifferent" for *Monell* liability (Dkt. 49 at 4) misunderstands the law. Specifically, the County argues that "*Monell* liability only addresses the ability to impute deliberate indifference liability to a municipal entity and does not serve as an independent way to create deliberate indifference liability. Plaintiffs must first show that some or all of Defendants were deliberately indifferent" (*id.* at 4; *see also* Dkt. 43-1 at 13 (arguing "Plaintiffs' *Monell* claim must be dismissed as Plaintiffs cannot show that Stacey's constitutional rights were violated")). The Ninth Circuit, however, has stated "municipal defendants may be liable under § 1983 even in

situations in which no individual officer is held liable for violating a plaintiff's constitutional rights." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019). Rather, as the Ninth Circuit has acknowledged, "constitutional deprivations may occur 'not . . . as a result of actions of the individual officers, but as a result of the collective inaction of the municipal defendant.'" *Id.* (quoting *Fairley v. Luman,* 281 F.3d 913, 917 (9th Cir. 2002)).

### c.    The County's Staffing Practice

Plaintiffs also assert the County "had a custom and a practice of understaffing MCDC, including on the date of Stacey's murder." (Dkt. 46 at 13). Understaffing at a correctional facility "increases the risk of inmate on inmate violence." *Castillon v. Corr. Corp. of Am., Inc.*, No. 1:12-CV-00559-EJL, 2016 WL 3676116, at *7 (D. Idaho July 7, 2016). To prevail on this claim, Plaintiffs must prove that the County had a policy of deliberate indifference to the risk of understaffing and that this policy caused the injury. *Id.* When understaffing appears to have contributed to a violation of an inmate's Eighth Amendment rights, a causal link exists between that violation and the prison's policy if the municipality had notice or constructive notice that the staffing issue poses a risk to inmate safety but failed to take corrective action. *Id.* (citing *Greason v. Kemp*, 891 F.2d 829, 838 n.18 (11th Cir. 1990)); *cf. Castro*, 833 F.3d at 1076 (explaining objective deliberate indifference requires "notice or *constructive notice*").

Plaintiffs identify several staffing policies which they contend the County violated. These policies include that: (1) the County "failed to conduct a comprehensive staffing analysis annually," as Federal Standard A.9.1 requires[10] (Dkt. 46 at 15); (2) the County "failed to maintain

---

[10]    Federal Standard A.9.1 provides that "a comprehensive staffing analysis is conducted annually. Essential posts and positions, as identified in the staffing plan, are consistently filled with qualified personnel" (Dkt. 46-1 at 324).

its correctional officer posts in the immediate prison living area," as Federal Standard C.1.3 requires[11] (*id.* at 14); (3) "supervisory level staff [failed] to conduct a daily patrol of all areas occupied by prisoners," as Federal Standard C.1.10 requires[12] (*id.* at 15); (4) the County failed to monitor inmates every forty minutes as Federal Standard C.1.4 requires[13] (*id.* at 13); and (5) the County failed to follow the MCDC's "Staffing Plan" (*id.* at 12-13). In support of these arguments, Plaintiffs cite the deposition testimony of various County employees (*see id.* at 13-15), and the report of Plaintiffs' expert witness, James Ferriera, who has expertise in correctional institution security (Dkt. 46-2).

Although Plaintiffs identify five different policy provisions with which they contend the County failed to comply, the County's reply is limited to one—namely, that it allegedly failed to follow the MCDC's Staffing Plan. That Plan provides, in part:

> <u>Detention Line Staff</u> The [MCDC] adheres to the Idaho Jail Standards which require[] a minimum of two detention officers on shift any time and detention staff conducts security check where they observe inmates at least every 40 minutes[.] [I]n order to accomplish this and all of the assigned duties, there will be five (5) detention staff on each day shift and five (5) detention staff on each graveyard shift.

> <u>Supervisory Personnel</u> Four (4) supervisory level staff, including Administrators and Shift Supervisors will be on duty on dayshift and one (1) will be on duty on graveyard shift. When no supervisory level staff are on duty, on-call supervisory

---

[11]     Federal Standard C.1.3 provides that "correctional officer posts are located in the immediate prison living areas to permit officers to see, hear, and respond promptly to emergency situations" (Dkt. 46-1 at 326).

[12]     Federal Standard C.1.10 provides that "supervisory staff conduct a daily patrol, including holidays and weekends, of all areas occupied by prisoners" (Dkt. 46-1 at 327).

[13]     Federal Standard C.1.4 provides that "prisoners classified as medium or maximum-security risks are personally observed by an officer at least every 40 minutes on an irregular schedule" (Dkt. 46-1 at 327). Plaintiffs' expert opines that in "the sixteen (16) hours leading up to the murder of Mr. Stacey nine (9) of the well-being checks exceeded the forty (40) minute threshold" (Dkt. 46-2 at 38; *see also* Dkt. 46-1 at 336 (showing MCDC's Staffing Plan requires forty-minute check also)).

MEMORANDUM DECISION AND ORDER - 20

personnel will be available to respond promptly and effectively in the event of crisis
or emergencies at the facility.

(Dkt. 46-1 at 336).

Plaintiffs argue that, contrary to this policy, "MCDC's daily shift rosters from 2021 reveal that MCDC regularly operated with only four detention deputies and on occasion only operated with three detention deputies" (Dkt. 46 at 13). Further, they argue that "on the day of Stacey's murder, there were only three detention deputies, one civilian reserve deputy, and one supervisory-level staff on duty" (*id.*). In response, the County asserts that "the County's policy allows supervisors who are POST certified to fill two roles at once"; Sergeant Grover, Deputy Hollis, Deputy Graves, Deputy Johansson, and Reserve Peterson were on duty the date of Stacey's murder; Sergeant Grover was "simultaneously filling a supervisor role at that time"; Captain Willmore was "on-call"; and "other administrative staff . . . were on duty or on call at the Sheriff's office, either the patrol division supervisors or the elected Sheriff" (Dkt. 49 at 7). Based on this information, the County argues it "did not violate its staffing policy" because there were "five line deputies" and "four or more supervisors" on shift at the time of Stacey's murder (*id.*).

Like the County's "holistic approach" to housing inmates, the County's routine staffing practices raise genuine issues of material fact whether those practices comport with MCDC's policies, the Idaho Standards, and the Federal Standards. A jury could infer from those policies that the County knew the importance of appropriate staffing and security checks and that the County's failure to follow them was substantially certain to result in a constitutional injury. *See, e.g.*, *Castro*, 833 F.3d at 1077-78 (concluding municipality's deliberate indifference may be inferred from adoption and disregard of policies acknowledging substantial risks of harm exist); *Sandoval*, 985 F.3d at 682-83 (same); *Horton by Horton*, 915 F.3d at 604 (noting jury might be

able to conclude inmate suffered constitutional deprivation because of "officers' adherence to departmental customs or practices").

Further, whether there is a direct causal link between the County's alleged failure to comply with staffing and security check policies and Stacey's murder presents genuine issues of material fact for trial. *See Canton*, 489 U.S. at 385 ("There must be a "direct causal link between a municipal policy and custom and the alleged constitutional deprivation."). The record shows that deputies failed to conduct timely well-being checks on the day of the murder. In the sixteen hours preceding the murder, nine checks were either delayed or skipped. Because officers were not stationed inside the housing units, they were unable to see, hear, or promptly respond to escalating tensions or emergencies—conditions which Plaintiffs' expert opines violated MCDC's policy and Federal standards and directly contributed to Stacey's death (Dkt. 46-2).

Also, the shift roster from the night before possibly reflects understaffing. On that roster, the designated fields for a supervisor and medical personnel are either blank or state "? IDK" and "who cares." Finally, the Tri-County Sheriff's Association, which investigated Stacey's death, gathered evidence indicating inadequate staffing may have contributed to the failure to detect escalating tensions in Pod D. Multiple inmates interviewed during the investigation reported that Stacey had been involved in an argument with Pompa's cellmate, Cody Williams, approximately one hour before the murder. Like the murder, the argument between Williams and Stacey related to a dispute over an electronic tablet. Further, during the investigation, the civilian reserve deputy assigned to monitor surveillance cameras described Williams' behavior immediately before the assault as a "predatory stalk," noting that Williams appeared to pace around Stacey in a "horseshoe" pattern and "knew what was going to happen."

MEMORANDUM DECISION AND ORDER - 22

Viewing this evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that the County failed to enforce its formal staffing plan, despite knowing risks to inmate safety, and that this failure is directly linked to the murder. Additionally, Plaintiffs contend that the video footage the County failed to preserve would have established this direct link. As discussed in further detail below, the County did not preserve any video from MCDC's control room on the day of the murder or the entirety of the video of Pod D on that day. Notably, the County did not preserve video of the alleged altercation between Stacey and Williams, which occurred approximately one hour before the murder and may have been related to the murder. As discussed below, the Court agrees the non-preserved video likely showed the deputies' activities on the day of the murder and whether there is a direct link between staffing and the murder. Even without this video, however, the record establishes a question of fact whether there was a direct causal link between the County's staffing practice and the murder.

### d.    The County's Classification Practice

Plaintiffs also argue that the County failed to train and supervise its staff on MCDC's classification procedure and that this procedure had "systematic deficiencies" which caused Stacey's death (Dkt. 46 at 3). In particular, Plaintiffs focus on MCDC's failure to adopt a policy or practice of obtaining and considering inmates' disciplinary histories from prior institutions. Plaintiffs' expert witness, however, also identifies several other alleged deficiencies in the implementation of MCDC's classification procedure, including: (1) failure to train staff in the proper use of the classification tree; (2) failure to train staff on the use of the "override" function in the classification tool; and (3) the Classification Deputy's failure to supervise and ensure consistent implementation of MCDC's classification procedure (Dkt. 46-2).

A municipality's failure to adequately train and supervise its employees in implementing a policy may constitute deliberate indifference. *Long*, 442 F.3d at 1188; *see also Berry v. Baca*, 379 F.3d 764, 768 (9th Cir. 2004); *see also Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1088 (9th Cir. 2000) (concluding policy of helping intoxicated individuals would not insulate county from liability for individual's death if plaintiff could show deprivation was caused by police department's deliberate indifference in failing to adequately train officers). "A plaintiff's burden is to establish 'that the injury would have been avoided had proper policies been implemented.'" *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1077 (S.D. Cal. 2023) (quoting *Long*, 442 F.3d at 1190).

In *Long*, the Ninth Circuit determined there was a triable issue of fact whether the county's policy of relying on medical professionals without training them how to implement proper procedures amounted to deliberate indifference. 442 F.3d at 1189. To support its conclusion, the Ninth Circuit cited medical records, depositions, and expert opinions, showing the county did not adequately train its employees to assess the plaintiff's medical condition. *Id.* at 1188. At the same time, the county provided evidence showing that it had adequately attended to and cared for the plaintiff. *Id.* at 1189. The contradictory nature of this evidence led to the conclusion that there was a triable issue for the jury. *Id.*

Here, Plaintiffs have presented evidence raising factual issues whether the MCDC classification procedure, as the County employees implemented it in practice, was constitutionally adequate. Sergeant Grover, the Classification Deputy, testified that he received no specialized training in inmate classification in the previous twenty years; he did not understand the distinction between the initial and the primary classification policies; and he did not ensure jail deputies were adequately trained in classification procedures, including the use of the classification tree.

Further, the record does not show that the Classification Deputy participated in assigning any primary classification levels. Instead, intake deputies typically made classification decisions using the classification tree, without any formal training, without using the tree's "override" function, and with little or no oversight from Sergeant Grover. Because MCDC did not require an objective point-based system, deputies subjectively determined the weight to afford each factor in the policy. Also, they were not required to obtain or review disciplinary histories unless the transporting officer provided it, even though Sergeant Grover acknowledged during his deposition that such information is important for proper classification.

Sergeant Grover also acknowledged Pompa should have been classified as maximum-security based solely on his criminal history. Sergeant Grover, however, failed to reclassify Pompa and, instead, downgraded his classification even after Pompa instigated a fight. Plaintiffs' expert witness opines that these fundamental breakdowns in MCDC's classification procedure created a substantial risk of serious harm and were a moving force in the murder.

As in *Long*, this evidence creates a triable issue of fact regarding whether MCDC had a pattern and practice of disregarding its own classification policies due to its failure to adequately train and supervise jail staff in implementing those policies and whether this longstanding practice demonstrated deliberate indifference to inmate safety and contributed to Stacey's death. *Long*, 442 F.3d at 1189 ("The evidence creates a triable issue of fact regarding whether the County's policy of relying on medical professionals without training them how to implement proper procedures for documenting, monitoring and assessing patients for medical instability within the confines of the MSB amounted to deliberate indifference.").

### 4.    Individual Liability

Plaintiffs allege the Individual Defendants are liable in their individual, supervisory capacities (Dkt. 46 at 17). Plaintiffs claim each Defendant was "instrumental" or "played an integral role" in policies, customs, and practices that were deliberately indifferent to Stacey's constitutional rights, including: (1) housing violent, maximum and medium-security inmates with non-violent, minimum-security inmates; (2) understaffing MCDC and failing to supervise inmates in accordance with MCDC's staffing plan and Federal Standards; and (3) failing to consider inmates' prior institutional behavior during classification (*id.* at 17, 19, 20). Plaintiffs further allege these practices demonstrate each Defendant's direct involvement, acquiescence, or reckless disregard for inmate safety and exposes them to individual liability (*id.*).

"[S]upervisors are not subject to vicarious liability but are liable only for their own conduct." *Bergquist v. Cnty. of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986), *abrogated on other grounds by City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). To hold a supervisory official liable under § 1983, the plaintiff must show either: (1) personal participation in the constitutional deprivation; or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Jeffers v. Gomez*, 267 F3d 895, 915 (9th Cir. 2001). "A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor." *Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011). A supervisor's "general responsibility for supervising the operations of a prison," however, "is insufficient to establish personal involvement." *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 14t5 (9th Cir. 1991) (citation omitted) (Thompson, J., dissenting).

MEMORANDUM DECISION AND ORDER - 26

Deliberate indifference, in this context, is subjective and requires proof that a defendant was not only "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" but also that "he must also draw the inference." *Farmer*, 511 U.S. at 837. As the Supreme Court has explained, "[a]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838. In other words, "[i]f a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d at 1060.

Here, Plaintiffs have not presented sufficient evidence to create a genuine issue of material fact that any Individual Defendant was both aware of facts indicating a substantial risk of serious harm to inmate safety and actually drew that inference. While Plaintiffs assert broadly that each Individual Defendant was "instrumental" or "played an integral role" in implementing or maintaining policies, customs, and practices that allegedly violated Stacey's constitutional rights, Plaintiffs fail to identify any evidence from which a reasonable jury could find that any Individual Defendant was subjectively aware of the risk these policies or practices posed. Absent such evidence, Plaintiffs' § 1983 claims against the Individual Defendants cannot survive summary judgment.

## B.    Spoliation Sanctions

Plaintiffs move for sanctions and seek an adverse inference jury instruction against the County for failing to preserve video footage from the day of the murder. Specifically, Plaintiffs challenge the County's failure to preserve video from the date of the murder showing: (1) an altercation between Stacey and Williams, who was Pompa's cellmate, which occurred

approximately one hour before the murder; and (2) the deputies' conduct in the control room leading up to and during the murder. Plaintiffs argue that this video "was plainly relevant to Plaintiffs' claim" and that the County breached its duty to preserve the video. The County does not dispute it did not preserve the video. Rather, it argues sanctions are not warranted because it intended to preserve the video and took reasonable steps to do so.

Captain Willmore testified during his deposition regarding the County's efforts to preserve the video footage from the day of the murder. He testified that he intended to save all that video so the County could show "the totality of this circumstance, the event, to paint the full picture of it all"; he understood all the video from the day of the murder would be relevant to future litigation about the murder; and further, he agreed the County's policies and procedures required it to preserve all video (Dkt. 37-2 at 114-15, 164). According to Captain Willmore, he tasked Lieutenant Backstein with saving the video from the date of the murder (*id.* at 114).

Lieutenant Backstein, however, did not save the video from the control room or Pod D showing the altercation between Williams and Stacey because, as the County describes it, "[t]he process to save the video is somewhat confusing" (Dkt. 41 at 8). According to Captain Willmore, Lieutenant Backstein intended to save all the video on the day of the murder; "bookmarked" that video to prevent the surveillance system from automatically overriding the video; but then failed to "click" a button to save the bookmarked video (Dkt. 37-2 at 114). In other words, preserving the video was a two-step process and Lieutenant Backstein intended but failed to complete that process. As a result, the County's surveillance system eventually overwrote the video automatically.

1.      **Legal Standard**

"Spoliation of evidence is the destruction or significant alteration of evidence, or the failure to properly preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Sanders v. Univ. of Idaho, Coll. of L.*, 634 F. Supp. 3d 936, 940 (D. Idaho 2022) (citation and quotation marks omitted). "A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). District courts have "broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Id.* When considering whether to impose a spoliation sanction, judges generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Schmid v. Milwaukee Elect. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).

The most recent amendment Rule 37(e) of the Federal Rules of Civil Procedure establishes the standard for determining sanctions for spoliation of electronically stored information (ESI). Under Rule 37(e), a party seeking sanctions for the loss of electronically stored information must show: (1) there was a duty to preserve the information; (2) the party who lost the information failed to take reasonable steps to preserve it; and (3) the information cannot be restored or replaced. *See* Fed. R. Civ. P. 37(e)(1).

If a party makes a threshold showing of spoliation, Rule 37(e) provides for two levels of sanctions. Under Rule 37(e)(1), if a court finds the offending party had a duty to preserve the ESI and the party's failure to do so prejudiced the moving party, the court "may order measures no greater than necessary to cure the prejudice." If the court further finds, however, that the offending

party "acted with the intent to deprive another party of the information's use in the litigation," the court may instruct the jury to presume the lost information was unfavorable to the offending party, dismiss the action, or enter a default judgment. Fed. R. Civ. P. 37(e)(2).

## 2.    Plaintiffs' Failure to Cite Rule 37(e)

In their opening brief, Plaintiffs rely on the Court's inherent authority to impose sanctions rather than Rule 37(e)'s standard. As the County correctly notes, however, Rule 37(e) exclusively governs the remedies for the spoliation of ESI. Fed. R. Civ. P 37(e), Advisory Committee Notes (explaining Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used."); *see also Newberry v. Cnty. of San Bernardino*, 750 Fed. App'x 534, 537 (9th Cir. 2018). The County argues the Court may deny Plaintiffs' motion for their failure to cite the correct standard.

Plaintiffs' failure, however, is not fatal to their motion. Rule 7(b) of the Federal Rules of Civil Procedure requires a motion to "state with particularity the grounds for seeking the order" and "the relief sought." "Cases construing Rule 7(b) hold that the particularity requirement is satisfied 'when no party is prejudiced by a lack of particularity or when the court can comprehend the basis for the motion and deal with it fairly.'" *In re Hurtado*, No. 09-16160-A-13, 2015 WL 6941127, at *3 (Bankr. E.D. Cal. Nov. 6, 2015) (quoting *Registration Control Sys., Inc. v. Compusystems, Inc.*, 922 F.2d 805, 807-08 (Fed. Cir. 1990)); *see also Crowl v. M. Chin Realty Trust*, 607 F. Supp. 2d 245, 246 (D. Mass. 2009).

Here, Plaintiffs' failure to cite Rule 37(e) has not prejudiced the County. As Plaintiffs note, their opening brief's analysis largely tracks Rule 37(e). Further, Plaintiffs' failure to cite Rule 37(e) did not preclude the County from addressing the correct standard; rather, the County addresses Rule 37(e) in its opposition. Finally, Plaintiffs rectified their error in their reply brief by arguing

the correct standard. Accordingly, Plaintiffs' failure did not prejudice the County, and the Court declines to deny Plaintiffs' motion based on their failure. *In re Hurtado*, 2015 WL 6941127, at \*3 ("But because Hurtado's opposition accurately identifies the grounds for Jones's claim for attorney's fees, Hurtado has not been prejudiced.").

### 3.    Timeliness of the Motion

Alternatively, the County argues the Court should deny Plaintiffs' motion as untimely because Plaintiffs did not file the motion when they first learned the County failed to preserve the video footage. In support, the County relies on *Sherwood v. BNSF Ry. Co.*, No. 2:16-CV-00008-BLW, 2019 WL 1413747, at \*1 (D. Idaho Mar. 28, 2019). In *Sherwood*, the plaintiff did not file a spoliation motion until the eve of trial despite the court's earlier directive to file such a motion during the discovery period. *Id.* In denying the plaintiff's motion, the court noted plaintiff's late filing and explained why the timing of the request for spoliation sanctions can be significant:

> All spoliation sanctions are extreme in effect. That is why a court, upon finding prejudice, "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). This, in turn, requires that a judge consider a full range of options, including ordering additional discovery that may remedy the loss of evidence, permitting additional depositions, or working with counsel to find other means of curing the prejudice without affecting the substantive rights of the parties. However, those options can only be undertaken while discovery is still ongoing, and can almost never be considered or applied on the eve of trial.

*Id.* While the *Sherwood* court noted the motion's late filing, it had already concluded "that a spoliation sanction was unwarranted. . . even if it had been requested in a timely manner." *Id.*

In *Sanders*, 634 F. Supp. 3d at 943, the court likewise noted the importance of bringing a motion for spoliation sanctions "during discovery." The plaintiff, however, did not learn the defendants had shredded the notes at issue until after the close of discovery; given this timing, the court rejected as "unreasonable" the defendants' argument that the plaintiff should have filed her motion for spoliation during discovery. *Id.* Further, the court was not convinced an alternative

remedy would have been available even if the plaintiff had been informed of the notes' destruction during discovery. *Id.* As the court explained, "there is no way to re-create notes which have been destroyed." *Id.* Finally, the court noted the moving party had not failed, as in *Sherwood*, to follow the court's directive about when to file the motion. *Id.* For all these reasons, the *Sanders* court found the spoliation motion was "appropriately brought in a motion in limine." *Id.*

Here, the Court finds Plaintiff's sanctions motion is timely. First, Plaintiffs brought their motion before the close of discovery and did not wait "until the eve of trial." Second, as in *Sanders*, additional discovery could not remedy the loss of the video footage. There is simply no way to re-create deleted video. Third, unlike in *Sherwood*, Plaintiffs did not fail to follow any court directive about when to file their sanctions motion. Accordingly, the Court addresses the merits of Plaintiffs' motion.

### 4.    Duty to Preserve

Rule 37(e) incorporates the common-law "duty to preserve relevant information when litigation is reasonably foreseeable." *Id.* A party must preserve evidence it knows or should know is relevant to a claim or defense of any party or may lead to the discovery of relevant evidence. *Compass Bank v. Morris Cerullo World Evangelism*, 104 F. Supp. 3d 1040, 1051 (S.D. Cal. 2015). "The duty to preserve relevant evidence commences prior to litigation once a defendant reasonably anticipates an action may be forthcoming." *Sanders*, 634 F. Supp. 3d at 940.

Here, the County claims it could not have reasonably anticipated litigation until Plaintiffs filed their notice of tort claim on March 26, 2022 – 169 days after Stacey's death and after the County's surveillance system had already overwritten the video footage from the day of the murder. The Court disagrees. The death of an inmate is a serious incident; the murder alone should have notified the County of impending litigation; and the seriousness of the injury created a duty

to preserve evidence. *See, e.g.*, *Bistrian v. Levi*, 448 F. Supp. 3d 454, 469 (E.D. Pa. 2020) ("A number of courts have found that government defendants reasonably should have anticipated litigation from the time an inmate was seriously injured or died in custody.") (collecting cases); *see also Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013) (counting inmate assaults as one of several "types of incidents [that] tend to trigger litigation"). The County's own policy of requiring an immediate investigation after the death of an inmate supports this conclusion. Such policies exist, in part, precisely because the serious injury or death of an inmate often leads to litigation. *See Hargis v. Overton Cnty., Tennessee*, No. 2:22-CV-00011, 2023 WL 8604139, at *9 (M.D. Tenn. Dec. 12, 2023) ("Policies like these exist, at least in part, because of a reasonable anticipation of litigation.") (citation, quotation marks, and brackets omitted).

Even if, however, the County could not have reasonably anticipated ligation at the time of Stacey's death, Plaintiffs' counsel sent multiple preservation letters to the County shortly after the murder (Dkt. 38 at ¶¶ 3, 5, 7). Those letters are entitled "Notice of Potential Litigation" and clearly notified the County it needed to preserve evidence related to the murder for purposes of the litigation. *See, e.g.*, *Sampson v. City of Cambridge, Md.*, 251 F.R.D. 172, 181 (D. Md. 2008) (concluding defendant's duty to preserve relevant ESI arose no later than date when plaintiff's counsel sent letter requesting preservation of relevant evidence, including ESI). Specifically, the letters requested the County: (1) discontinue all data destruction and backup-type recycling policies pertaining to ESI; (2) immediately cease modifying or deleting any electronic data from its online storage and direct access storage devices unless a computer forensic expert made a mirror image of the electronic file; and (3) immediately suspend all activity that might result in destruction or modification of all of the data stored on any offline media (Dkt. 38 at 9-10; 18-19; 26-27). Accordingly, Plaintiffs triggered the County's duty to preserve evidence when the County received

the preservation letters. *See Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1237 (N.D. Cal. 2022) (concluding defendant had duty to preserve evidence because automatically deleted data included information relevant to case and user knew log included relevant information).

###### 5.    Reasonable Steps to Preserve the Video Footage

"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Su v. NAB LLC*, No. 2:21-CV-00984-JCM-EJY, 2023 WL 9494449, at *3 (D. Nev. Dec. 4, 2023) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003)); *see also Compass Bank*, 104 F. Supp. 3d at 1052. "When the relevant evidence is video footage that will automatically record over itself, parties to litigation need only take the simple step of saving the video onto a hard drive." *Su*, 2023 WL 9494449, at *3. Under Rule 37(e), reasonable steps to preserve video include saving the video for future use and establishing a proper procedure for its preservation. *Id.*

Here, the County failed to take "reasonable steps" to preserve the video footage. Although Rule 37(e) does not demand "perfection," the County is a sophisticated party, and both its policies and its employees' deposition testimony establish it understood its duty to preserve the video. *See* Fed. R. Civ. P. 37 advisory committee note (explaining courts "should be sensitive to the party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, particularly individual litigants, may be less familiar with preservation obligations than others who have considerable experience in litigation"). Further, "events outside of [the County's] control" did not cause the failure to preserve the video; namely, the computer room was not flooded, the "cloud" service did not fail, and "a malign software attack" did not disrupt the storage system. *Id.*

Instead, the County failed to preserve the video because the procedure to save video footage is "somewhat confusing," and Lieutenant Backstein merely "bookmarked" the video and "inadvertently" failed to take "the second step to click save" (Dkt. 41 at 8). As a result, the County failed to take reasonable steps to ensure the video's preservation. *See, e.g.*, *Collins v. Autozone, Inc.*, No. 2:22-CV-00316-CDS-BNW, 2024 WL 1054684, at *5 (D. Nev. Mar. 11, 2024) (noting that locking video to be saved was insufficient to establish party "who ought to be sophisticated with litigation matters and the duty to preserve evidence," took reasonable steps to preserve the video). *Graham v. City of Lone Grove, Oklahoma*, No. 19-CV-00298-JFH, 2022 WL 2276337, at *5 (E.D. Okla. June 23, 2022) (concluding defendant failed to take reasonable steps to preserve video evidence when "the problem could have been identified and possibly solved before the footage was lost if *anyone* had bothered to check that the video included the full footage"). Further, that Lieutenant Backstein may not have been trained on or understood the procedure for preserving the video does not absolve the County of its responsibility to preserve it. *See Freidig v. Target Corp.*, 329 F.R.D. 199, 208 (W.D. Wis. 2018) ("But Target cannot dodge its responsibilities by claiming that its employee was ignorant; Target is responsible for its employees' actions").

### 6.    Restoration or Replacement of the Video

As noted above, the video footage cannot be restored or replaced because the County's surveillance system overwrote it. "Using other evidence, such as witness statements, to speak to what the destroyed video surveillance depicted does not constitute 'restoring or replacing' the lost evidence." *Su*, 2023 WL 9494449, at *4. Further, taking the depositions of inmates and detention deputies is insufficient because "[m]emories fade and deponents may be biased in their recollections." *Phan v. Costco Wholesale Corp.*, No. 19-CV-05713-YGR, 2020 WL 5074349, at *3 (N.D. Cal. Aug. 24, 2020). Testimony cannot replace video that would have objectively shown

the circumstances leading to the murder. *Id.* Moreover, the County does not point to any evidence that would entirely replace the value of the video. *Id.*

### 7. Prejudice under Rule 37(e)(1)

"Prejudice exists where the spoiling party's actions impaired the moving party's ability to go to trial or threatened to interfere with the rightful decision of the case." *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 979 (N.D. Cal. 2022) (citations, quotation marks, and brackets omitted). Upon the showing of prejudice, a court may order measures no greater than necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1). The court has significant discretion in determining what satisfies this standard. *See* Fed. R. Civ. P. 37 advisory committee's note to the 2015 Amendment. Here, the County's failure to preserve the video footage prejudices Plaintiffs because it interferes with Plaintiffs' ability to show what occurred in the video, to examine witnesses about the video's contents, and to argue that events reflected in the video—such as the altercation between Stacey and Williams before the murder or the deputies' conduct in the control room—contributed to Stacey's death. Because the video footage is relevant and can neither be restored nor retrieved, the Court imposes sanctions under Rule 37(e)(1).

### 8. Intent to Deprive under Rule 37(e)(2)

Although the Court may impose a sanction, Plaintiffs have failed to show the County "acted with the intent to deprive" them of the use of the video footage in the litigation, which showing is necessary for an adverse inference jury instruction. Fed. R. Civ. P. 37(e)(2). "[C]ourts have found that a party's conduct satisfies Rule 37(e)(2)'s intent requirement when the evidence shows or it is reasonable to infer, that the party purposefully destroyed evidence to avoid its litigation obligations." *Porter v. City & Cnty. of San Francisco*, No. 16-CV-03771-CW(DMR), 2018 WL 4215602, at *3 (N.D. Cal. Sept. 5, 2018); *see also hiQ Labs*, 639 F. Supp. 3d at 977 (explaining

evidence of "a specific intent to deprive, rather than a mere knowing failure to preserve" is required for imposition of sanctions under Rule 37(e)(2)). However, "[n]egligence—even gross negligence—in failing to retain relevant evidence is not sufficient to support an adverse inference under Rule 37(e)(2)." *Meta Platforms*, 605 F. Supp. 3d at 1238.

Here, Plaintiffs have not presented any evidence of a specific intent to destroy the video footage. While the County could have and should have taken additional steps to ensure the video's preservation, the evidence does not indicate the County intentionally spoliated the video. To the contrary, the evidence indicates the County intended to preserve the video, believed it had, but did not. At most, the County's conduct "amounts to gross negligence, not intentional malfeasance." *Porter*, 2018 WL 4215602, at *4 (finding no evidence of intentional spoliation where defendant "erased the call pursuant to its 2-year ESI retention policy"); *see also Meta Platforms*, 605 F. Supp. 3d at 1238 (finding defendant did not act "with the intent to deprive" plaintiff of evidence where evidence was negligently deleted in ordinary course of business). Therefore, the Court finds an adverse inference jury instruction is not warranted. *See, e.g.*, *hiQ Labs*, 639 F. Supp. 3d at 977 (declining to give adverse inference instruction where evidence showed plaintiff allowed evidence to be destroyed "either negligently or with an intent to cut costs" but not a "specific intent" to deprive defendant of evidence).

### 9.      Appropriate Sanctions

Regardless, because the Court finds the County's failure to preserve the video footage prejudices Plaintiffs, it may impose an appropriate sanction under Rule 37(e)(1). Under Rule 37(e)(1), it has broad discretion to employ measures "no greater than necessary to cure the prejudice" suffered by the non-spoliating party. Such measures may include "forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to

present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument[.]" Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment. "In selecting an appropriate remedy, courts are to choose the least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered by the victim." *Sanders*, 634 F. Supp. 3d at 944 (citation and quotation marks omitted).

Here, the Court finds an appropriate sanction is to inform the jury that the County had a duty to preserve the video footage; Plaintiffs notified the County of that duty; but regardless, the County failed to preserve the video; and as a result, the County's failure prevents the jury from viewing what occurred in the control room on the day of the murder and what occurred in Pod D leading up to the murder. *See., e.g.*, *Porter*, 2018 WL 4215602, at *4; *hiQ Lab*, 639 F. Supp. at 975. The Court finds such instruction to be an appropriate sanction because it balances the importance of the video with the degree of the County's fault and the extent of prejudice to Plaintiffs. The Court will entertain further argument about the exact wording of an appropriate instruction during the pretrial proceedings.

## IV.    ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Motion for Sanctions for Spoliation of Evidence (Dkt. 37) is **GRANTED in part and DENIED in part.** Plaintiffs are entitled to a jury instruction informing jurors that the video footage was spoliated.

2.  Defendants' Motion for Summary Judgment (Dkt. 43) is **GRANTED in part and
    DENIED in part**.

DATED: August 06, 2025

Amanda K. Brailsford
U.S. District Court Judge